UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: JUN 2 9 2015
```

Columbia Casualty Company,

  Plaintiff, Counterclaim-Defendant,

  —v—

Neighborhood Risk Management Corporation,

  Defendant, Counterclaim-Plaintiff.

14-cv-0048 (AJN)

MEMORANDUM &
ORDER

ALISON J. NATHAN, District Judge:

Plaintiff Columbia Casualty Company ("Columbia") brings this action for a declaratory judgment and, in the alternative, for reformation of a provision of its casualty insurance contract with Defendant Neighborhood Risk Management Corporation ("Neighborhood Risk").[1] Neighborhood Risk has moved to dismiss Columbia's Amended Complaint under Federal Rule of Civil Procedure 12(b)(6), *see* Dkt. No. 64, and has requested that the Court take judicial notice of certain documents in conjunction with its motion, *see* Dkt. No. 66-1. Columbia, in addition to opposing the motion to dismiss, has moved the Court to strike from the record the documents that Neighborhood Risk has offered for judicial notice, *see* Dkt. No. 79. For the following reasons, Columbia's motion to strike the documents from the record is DENIED, and Neighborhood Risk's motion to dismiss is DENIED.

## I.   Background

For the purpose of evaluating Neighborhood Risk's motion to dismiss, the Court accepts as true all well-pleaded allegations in the Amended Complaint, and draws all reasonable inferences in Columbia's favor. *See Barrows v. Burwell*, 777 F.3d 106, 111 (2d Cir. 2015).

---

[1] In its January 26, 2015 Memorandum & Order deciding Columbia's motion to dismiss Neighborhood Risk's third counterclaim, the Court began the practice of referring to the parties by name rather than as "Plaintiff" and "Defendant" to avoid sowing any confusion over the parties' identities, based on the existence of several counterclaims. *See* Dkt. No. 97. The Court will continue that practice here.

1

Neighborhood Risk is a nonprofit member organization that assists its members in obtaining property and general liability insurance at lower rates and with broader coverage than they could obtain individually. Am. Compl. ¶ 11. To that end, it obtained an insurance policy from Columbia that was effective from April 1, 2010 to April 1, 2011. Am. Compl. ¶ 17. As a standard feature of its insurance policies, and one that was present in its 2010-11 policy with Columbia, Neighborhood Risk maintains control over a "retention fund" comprised of certain amounts paid by each of its members. Am. Compl. ¶ 15. The retention fund is used to self-insure a portion of Neighborhood Risk's insurance coverage; Neighborhood Risk would thus maintain responsibility for ensuring some portion of the insurance claims filed during the policy year, and the insurer issuing the policy would cover the remainder of the claim or claims. Am. Compl. ¶ 15. According to Columbia, the retention amount would be depleted by amounts paid on claims, amounts posted in reserve on claims, and administrative expenses. Am. Compl. ¶ 16.

The contract between Neighborhood Risk and Columbia for the policy year 2010-11 set Neighborhood Risk's retention amount for the year at $1.125 million, with a maximum to be paid from the fund of $100,000 per occurrence. Am. Compl. ¶¶ 16-17. The relevant terms of the "Self Insured Retention Endorsement," which is the contract provision setting forth the parties' agreement about the retention amounts and other obligations surrounding the retention, are set forth at Appendix A to this Memorandum as they appear in the Amended Complaint.

On Neighborhood Risk's request, Columbia also agreed to include a provision that would allow Neighborhood Risk to buy out the remainder of its potential liability on the self-insured retention three years after the 2010-11 policy was set to go into effect. Am. Compl. ¶¶ 2-3. This provision, which the parties refer to as the "Buy-Out Endorsement," was negotiated between Columbia and various agents of Neighborhood Risk, including one Albert Shapiro. Am. Compl. ¶ 21-22, 26. According to Columbia, Neighborhood Risk and its agents knew at all times that the Buy-Out terms provided that Neighborhood Risk would pay the full amount of incurred losses to the self-insured retention, and an additional premium of twenty-five percent on those losses, in exchange for Columbia's assumption of all costs for claims raised after the buyout.

2

Am. Compl. ¶ 25. The full Buy-Out Endorsement reads (all emphasis and formatting as in original):

SIR BUYOUT TERMS

1) All open claims handled by the TPA firm will be reviewed by CNA claims 30-33 months from the inception date of the policy

2) The following methodology will be used to calculate the Additional Premium required in order for CNA to assume liability for losses in the insured's retention after three years (36 months) of development.

   Additional Premium = Policy Period Losses evaluated as of 36 months x 0.25

   The losses will be evaluated as of 36 months *in the loss run from the TPA [Third-Party Administrator]*.

   For example, losses for the 4/1/2010-2011 policy period will be evaluated as of 3/31/2013.

   Policy Period Losses include:
   -Paid Losses
   -Paid ALAE
   -Case Loss Indemnity Reserves
   -Case ALAE Reserves
   -All claims within the insured's 100,000 retention, open and closed, on a first dollar basis

3) CNA will calculate the additional premium for SIR buy-out approximately 37 months from inception.

4) CNA will prepare a premium bearing endorsement in April 2013 with the additional premium for the buy-out. The insured must pay this additional premium within 30 days of offer. If the premium is not paid within this time frame, the SIR buy-out terms will not apply. The Self-Insured Retention Endorsement terms will continue to apply.

5) The additional premium will be booked as premium with commission.

6) The insured's retention will become Nil after payment of the additional premium.

7) The $1,125,000 SIR Aggregate listed on the Self-Insured Retention Endorsement is the maximum retention for the insured.

Am. Compl. ¶ 29. The parties arrived at this language after Neighborhood Risk requested revisions to some of the terms that Columbia initially proposed. Am. Compl. ¶ 28.

Neighborhood Risk's agent and broker, RT Specialty, asked Columbia to conduct a claims review pursuant to the Buy-Out Endorsement in December 2012. Am. Compl. ¶ 32. Columbia then requested updated loss statistics from the third-party administrator, but when it received them, discovered that they were inaccurate because some claims were improperly being held in reserve. Am. Compl. ¶¶ 32-33. After this issue was resolved to Columbia's satisfaction, it submitted its first buyout quote to RT Specialty, which was $212,202.64, in addition to the transfer of any funds originally in the retention amount that were already placed in reserve for pending claims, which is what Columbia believed the contract required. Am. Compl. ¶ 34.

Neighborhood Risk requested an additional 30 days past its initial deadline to consider the quote. Am. Compl. ¶ 35. However, Columbia alleges that on July 22, 2013, Neighborhood Risk agent Albert Shapiro told Neighborhood Risk that he had an "epiphany," and discovered a "flaw" in the Buy-Out Endorsement that worked in Neighborhood Risk's favor. Am. Compl. ¶¶ 37-38. Believing that the Endorsement did not state what would happen to the reserves, Shapiro advanced what he called a "literal" interpretation of the contract, under which posted reserves would remain with Neighborhood Risk if it exercised its buyout option. Am. Compl. ¶¶ 37-40. Neighborhood Risk made a counteroffer on July 25, 2013 of $174,648.39 to exercise the buyout and satisfy all of its remaining obligations under the contract. Am. Compl. ¶ 40.

Columbia rejected this offer, but continued to negotiate with RT Specialty through the summer of 2013. Eventually, Columbia quoted Neighborhood Risk a new buyout premium of $174,649, plus the transfer of the $445,298 that remained posted in reserves. Am. Compl. ¶ 41. Neighborhood Risk rejected this offer. Am. Compl. ¶ 41. RT Specialty advised Columbia on August 22, 2013 that Neighborhood Risk was nevertheless willing to compromise, and further negotiation led Columbia to make a third written quote of $517,747, to satisfy all of

Neighborhood Risk's obligations to both pay the buyout premium and transfer the posted reserves in order to exercise the buyout clause. Am. Compl. ¶ 43. Neighborhood Risk (through Shapiro) attempted to continue negotiations but Columbia represented that it had made its final offer, and on October 18, 2013, Neighborhood Risk rejected it. Am. Compl. ¶¶ 44-45.

Columbia filed this declaratory judgment action on January 6, 2014, *see* Dkt. No. 1, and filed the Amended Complaint on October 24, 2014, Dkt. No. 58. Neighborhood Risk's motion to dismiss was filed on November 7, 2014, and Columbia's motion to strike certain documents was filed on November 24, 2014. On January 26, 2015, the Court granted a motion by Columbia to strike Neighborhood Risk's third counterclaim. Dkt. No. 97.

## II.    Motion to Strike

Because Neighborhood Risk bases portions of its argument in its motion to dismiss on the documents that it has offered for judicial notice, the Court will first take up Columbia's motion to strike those documents from the record. The documents that Neighborhood Risk has proffered, without argument as to the appropriateness of judicial notice, are: (1) an email chain including six days' worth of correspondence in March 2010 between an actuary and an underwriter at CNA, Columbia's parent company; (2) a copy of deposition testimony by CNA Claims Manager Karen Klein; (3) a copy of excerpts from deposition testimony by CNA underwriter Gale Smith; and (4) a copy of the "Common Policy Conditions" of the disputed insurance policy. *See* Dkt. No. 66-1 at 1. Columbia moves to strike documents (1), (2), and (3), none of which were attached to or referenced in the Amended Complaint.

Although the relief that Columbia seeks with its motion is to have the documents stricken from the record, its motion implicates two separate questions. The first is whether judicial notice of those matters is appropriate, and if the Court should consider them when evaluating the motion to dismiss. There is also the separate question of whether the documents should be stricken from the record, but it is not at all necessary that the Court take judicial notice of the documents even if it chooses not to strike them.

### A.  Judicial Notice

In addition to matters that are attached to the complaint or incorporated by reference, the Court may consider "matters of which judicial notice may be taken" when evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). A court may take judicial notice of a fact that is "not subject to reasonable dispute," either because it is "generally known within the trial court's territorial jurisdiction," or because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

Nowhere in its briefing does Neighborhood Risk attempt to demonstrate that the documents it has offered contain anything other than disputed factual matters, except for a bare assertion that they are "indubitably proper subjects of judicial notice." Def. Mem. at 2 (Dkt. No. 84). It is not, in fact, so indubitable. Neighborhood Risk touts the probative value of each document when explaining the propriety of judicial notice, but the fact that a document is particularly helpful to one party does not make judicial notice proper. None of the documents that Neighborhood Risk has proffered contain matters of common knowledge that would otherwise be known within this district; instead, they are matters found during discovery that bear on disputed issues in this case, such as the drafting of the insurance contract and the timing of the parties' performance of certain obligations under it. Nor do these facts come from sources whose accuracy cannot reasonably be questioned. Two of the documents contain transcripts of deposition testimony, and another is the contents of emails between employees of Columbia's parent company. The facts and inferences that Neighborhood Risk seeks to establish from these documents, which include whether Columbia unilaterally drafted the contract, when Columbia began its review of the contract, and the requirements of the contractual formula, could all be subject to reasonable dispute. At any rate, the Second Circuit has already explained that it is improper to take judicial notice of witness testimony for the truth of its contents (as opposed to the existence of such testimony), and the fact that Neighborhood Risk has offered testimony from a deposition rather than another judicial proceeding is even further reason to decline to take judicial notice. *See Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d

Cir. 2006). Similarly, the content of emails obtained in discovery is not the proper subject of judicial notice, even if they were discussed in a judicial opinion, which the ones proffered here were not. *See In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 626 n.21 (S.D.N.Y. 2005) (citing *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998)).

Neighborhood Risk's argument that judicial notice is appropriate because Columbia was elsewhere "distinctly more aggressive" in offering materials for judicial notice is also without merit. Even assuming that Neighborhood Risk is correct that Columbia has also made improper requests for judicial notice, there is no recrimination principle in Federal Rule Evidence 201. Whether an adversarial party has also offered to the Court materials over which it would be improper to take judicial notice has no bearing on the judicial notice analysis.

There is no basis for the Court to take judicial notice of the documents offered by Neighborhood Risk, and accordingly the Court declines to do so. Furthermore, because the documents do not otherwise fall within one of the categories of materials that the Court may consider when evaluating the motion to dismiss under *Chambers*, the Court will <u>not</u> consider these documents for the purpose of deciding Neighborhood Risk's motion.

### B. Whether to Strike

That the Court declines to take judicial notice does not compel the Court to strike the documents from the record. Columbia raises its motion under Federal Rule of Civil Procedure 12(f), which allows the Court to strike from a pleading insufficient defenses and matters that are "redundant, immaterial, impertinent, or scandalous." Fed. R. Civ. P. 12(f). By its terms, Rule 12(f) applies only to pleadings, which is fatal to Columbia's motion: a motion to dismiss is not a pleading, and therefore not subject to a Rule 12(f) motion to strike. *See Locksley v. United States*, No. 05-cv-2593 (JGK), 2005 WL 1459101, at *4 (S.D.N.Y. June 15, 2005) (citing *Rosen v. Raum*, No. 90-cv-7966 (CSH), 1991 WL 79195, at *1 (S.D.N.Y. May 3, 1991)); *see also Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 242 (2d Cir. 2007) (motion to dismiss is not a pleading). Courts routinely deny Rule 12(f) motions on the grounds that the document or

matter to be stricken is not contained in a pleading, and this case presents no exception. *See, e.g.*, *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Hicks, Muse, Tate & Furst, Inc.*, No. 02-cv-1334 (SAS), 2002 WL 1482625, at *6 (S.D.N.Y. July 10, 2002) (citing *Sierra v. United States*, 97-cv-9329 (RWS), 1998 WL 599715, at *9 (S.D.N.Y. Sept. 10, 1998)). Accordingly, although the Court will not consider the documents in its evaluation of Neighborhood Risk's motion to dismiss, Columbia's motion to strike is denied.

With the motion to strike decided, the Court now turns to Neighborhood Risk's motion to dismiss.

### III.   Motion to Dismiss Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead sufficient factual allegations to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To do so, the plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). These factual allegations must raise a right to relief that is plausible, rather than merely speculative. *Twombly*, 550 U.S. at 555. Conclusory statements that a defendant is liable on a plaintiff's claims are not sufficient, and a court need not accept the truth of "a legal conclusion couched as a factual allegation." *Id.* (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

When deciding a motion under Rule 12(b)(6), a court may consider, in addition to the allegations in the complaint, "documents attached to the complaint as an exhibit or incorporated in it by reference, matters of which judicial notice may be taken, or documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)) (alterations omitted). A document is incorporated by reference when the plaintiff relies on its terms and effects when drafting the complaint. *Chambers*, 282 F.3d at 153.

### IV.   Choice of Law

Before proceeding to the merits of Neighborhood Risk's motion, Columbia has raised an antecedent question of the appropriate choice of law. Columbia suggests that Massachusetts law should govern any issues of contract interpretation and reformation. Federal courts exercising diversity jurisdiction apply the choice-of-law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). New York choice-of-law rules therefore govern this action. As an initial matter, it is not necessary to conduct a choice-of-law inquiry if there is no substantive conflict between the laws of the relevant jurisdictions, and courts are free to apply New York law if it is otherwise among the possible choices. *Int'l Bus. Machs. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004) (citing *In re Allstate Ins. Co. & Stolarz*, 613 N.E.2d 936, 937 (N.Y. 1993)). The parties have not identified any difference in the way New York and Massachusetts would interpret the insurance contract at issue here, and even Columbia has continued to apply New York law to its argument concerning contract interpretation. *See, e.g.*, Def. Mem. in Opp. at 4-5. The Court's independent research further revealed no fundamental distinction between the manners that Massachusetts and New York courts would interpret an insurance contract. *See, e.g., Surabian Realty Co. v. NGM Ins. Co.*, 971 N.E.2d 268, 271 (Mass. 2012) (interpretation of insurance policy under Massachusetts law is no different than interpretation of any other contract; contracted interpreted as a whole rather than by reading words in a vacuum; language only ambiguous when it supports a reasonable difference of opinion); *Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir. 2000) (detailing largely similar principles under New York law); *Cont'l Ins. Co. v. Atl. Cas. Ins. Co.*, 603 F.3d 169, 180 (2d Cir. 2010) (insurance policy treated as any other contract under New York law). Accordingly, and in light of the parties' agreement, the Court will apply New York law to Count One of the Amended Complaint.

As for Count Two, Columbia argues that there is a difference in the way New York and Massachusetts courts would treat a claim for reformation of a contract. Ordinarily, New York courts apply the so-called "grouping of contacts" approach when considering choice-of-law questions in contracts cases. *See In re Allstate Ins. Co.*, 613 N.E.2d at 939 (citing *Auten v.*

*Auten*, 124 N.E.2d 99, 101-02 (N.Y. 1954)); *see also Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1539 (2d Cir. 1997). This test, which is derived from Restatement (Second) of Conflict of Laws § 188, *see Allstate*, 613 N.E.2d at 939, is designed to have courts apply the law of the state with the most significant relationship with or interest in the dispute, *Brink's Ltd. v. S. African Airways*, 93 F.3d 1022, 1030 (2d Cir. 1996) (citing *Babcock v. Jackson*, 191 N.E.2d 279, 283-84 (N.Y. 1963)). However, because Columbia and Neighborhood Risk agree that Massachusetts law governs construction and reformation of the contract, a full analysis under the grouping-of-contacts approach is unnecessary. Under New York choice-of-law rules, parties may consent to the law to be applied unless strong countervailing public policy counsels otherwise. *Walter E. Heller & Co. v. Video Innovations, Inc.*, 730 F.2d 50, 52 (2d Cir. 1984) (citing *Martin v. City of Cohoes*, 332 N.E.2d 867, 869 (N.Y. 1975) ("[P]arties to a civil litigation, in the absence of a strong countervailing public policy, may consent, formally or by their conduct, to the law to be applied."); *see also Fed. Ins. Co. v. Am. Home Ins. Co.*, 639 F.3d 557, 566-67 (2d Cir. 2011). The parties agree that Massachusetts law will apply to the extent that New York and Massachusetts treat reformation of contracts differently, which is enough to end the inquiry. Massachusetts law will apply to Count Two.

### V. Declaratory Judgment

In the Amended Complaint, Columbia seeks a declaration that all reserves posted as of March 31, 2013 would follow the claims for which they were originally posted, regardless of whether Neighborhood Risk exercised the buyout option before the reserves were released. *See* Am. Compl. ¶ 49. Neighborhood Risk moves to dismiss on the premise that the language of the insurance contract is unambiguous, and that a reasonable mind could not reach the interpretation that Columbia puts forth. *See* Def. Mem. at 7 (Dkt. No. 66). Instead, calling the buyout formula "as clear as it gets," Def. Reply Mem. at 2 (Dkt. No. 83), Neighborhood Risk posits that the only reasonable conclusion is that all posted reserves should be returned to it if it pays the buyout premium.

The parties agree on the pertinent aspects of New York law that govern interpretation of the contract. When evaluating a contract, a court must first determine whether, after looking only within the "four corners of the document," the contract is ambiguous. *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009) (citing *Kass v. Kass*, 696 N.E.2d 174, 180 (N.Y. 1998)). To determine whether a contract is ambiguous, a court

> should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed. Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby. Form should not prevail over substance and a sensible meaning of words should be sought[.]

*Kass*, 696 N.E.2d at 180-81 (quoting *William C. Atwater & Co. v. Panama R.R. Co.*, 159 N.E. 418, 419 (N.Y. 1927)). An insurance policy will be considered unambiguous if the portion under examination has a "definite and precise meaning" whose intention cannot be misunderstood, and when reasonable minds could not differ over its interpretation. *Breed v. Ins. Co. of N. Am.*, 385 N.E.2d 1280, 1282 (N.Y. 1978); *see also Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 299 (2d Cir. 1996) ("A contract is ambiguous where reasonable minds could differ on what a term means[.]"). Meanwhile, ambiguous language is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000) (quoting *Seiden Assocs., Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir. 1992)).

Neighborhood Risk's argument is light on analysis: it states that Columbia has not pleaded a reasonable interpretation of the contract necessary even to create an ambiguity, let alone to support a declaratory judgment in its favor. In many ways, Neighborhood Risk's own arguments demonstrate the flaws in their motion. First, their argument runs counter to explicit principles of New York law by attempting to set forth an interpretation of words of the buyout clause in isolation, rather than viewing them in the context of the whole contract. *See Revson*,

11

221 F.3d at 66. (The same principle would apply were Massachusetts law applied to this claim. *See Cofman v. Acton Corp.*, 958 F.2d 494, 498 (1st Cir. 1992).) Neighborhood Risk's laser-like focus on the terms of the buyout formula, beyond simply applying the wrong mode of analysis, is particularly fatal in this action, where the terms and structure of the entire contract are what inject ambiguity into the terms of the buyout agreement—the buyout provision itself is unintelligible if not read in light of the entire contract.

Neighborhood Risk also relies heavily on the proffered deposition testimony of Gale Smith, who (according to Neighborhood Risk) took part in drafting the buyout terms. The Court already has concluded that it cannot consider Ms. Smith's deposition testimony at the motion to dismiss stage, *see supra* at 6, but Neighborhood Risk's reliance on Ms. Smith's testimony demonstrates that its position is untenable. Its argument is that the contract was unambiguous, but the existence of ambiguity is determined entirely from the within the four corners of the document. *See JA Apparel Corp.*, 568 F.3d at 396. By pointing to extra-contractual evidence to make its argument, Neighborhood Risk all but concedes that the terms of the contract are not sufficiently unambiguous to prevent Columbia from stating a claim for declaratory judgment.

Finally, turning to the language of the agreement itself, Neighborhood Risk's argument focuses on the buyout formula—that, if it pays one-fourth of the sum of paid losses, paid allocated loss-adjusted expensed ("ALAE"), case loss indemnity reserves, case ALAE reserves, and "all claims within the insured's 100,000 retention, open and closed, on a first dollar basis," its "retention will become Nil after payment of the additional premium." Dkt. No. 58-1. However, that isolated language does not define what remains in the insured's "retention" for the purposes of reducing it to zero, and specifically whether posted reserves are still part of the self-insured retention, or whether they become conceptually distinct from the remaining retention funds when they are posted for an open claim. Looking at the agreement as a whole, a reasonable person could construe the contractual terms to place reserves outside of the retention calculation. Most notably, the self-insured retention endorsement provides that the retention "shall be eroded by allocated claim costs including defense and/or by pure loss of indemnity

12

costs." Dkt. No. 58-1. The contract goes on to define "claim costs" as "all expenses associated with the investigation, defense, and settlement of any claim, including, but not limited to the supplementary payments," but it does not contain a definition of when these costs become "allocated." A reasonable person could conclude that once funds are placed into reserve for a particular claim, they are "allocated" costs for that claim. The flaw in Neighborhood Risk's argument is that the clarity of the buyout formula itself does not end the inquiry when it is ambiguous exactly which expenses the insured is "buying out."

Finally, the internal logic of the insurance contract as a whole, and the buyout provision in particular, tends to demonstrate that the contract does not unambiguously require Neighborhood Risk's interpretation. As Neighborhood Risk acknowledges, its reading of the contract reduces the buyout provision to a speculative venture on Columbia's part: it would profit from the buyout provision at the time the buyout was paid only if the amount of paid losses sufficiently exceeded the remaining open losses with posted reserves such that a quarter of the sum was greater than the remaining open losses. *See* Def. Mem. at 4-5 (Dkt. No. 66). For example, if at the time the buyout option became available there were $400,000 of paid losses and allocated loss-adjustment expenses, and $100,000 worth of open losses and expenses, the buyout would cost Neighborhood Risk $125,000 (($400,000+$100,000) x 25%), meaning it would pay Columbia $25,000 more than the open losses for which it would otherwise be responsible. If, however, the numbers were reversed ($100,000 in paid losses compared to $400,000 in open losses), then Neighborhood Risk would pay $125,000 and, on its telling, shunt off the remaining $275,000 it would otherwise be responsible for onto Columbia—resulting in an immediate $150,000 loss for Columbia as a result of the buyout. Furthermore, Neighborhood Risk's argument ignores the fact that, because of the buyout, Columbia is assuming the full risk for any losses incurred after the buyout date, meaning that even it turned a marginal profit on the buyout date, it may ultimately suffer significant losses from the buyout down the road. (Columbia was surely assuming some level of risk by offering the buyout option, but it is not clear from the terms what that level of risk should be.) It is not at all obvious that the contract

13

terms unambiguously require this result, particularly in light of the buyout provision's silence as to what happens to "policy period losses," as opposed to funds still in Neighborhood's Risk retention.

If the contract were read according to Columbia's interpretation, the Buy-Out Endorsement would still be mutually beneficial: Columbia would receive the buyout amount, and Neighborhood Risk would free up any funds in the retention amount over and above the combination of open losses plus buyout premium, which otherwise would be sequestered indefinitely.  In either of the scenarios above, for example, Neighborhood Risk would pay an aggregate of $625,000 over the three-year life of the contract to cover both its original contractual obligations and the buyout premium, and would thereby free up for itself the remaining $500,000 in the $1.125 million retention.  If enough paid and open losses were incurred to push the combination of its extant liability plus the buyout premium over $1.125 million, Neighborhood Risk could choose not to exercise the buyout option.  The contract does not unambiguously show that this result is wrong.

Even though both parties argue that their interpretations of the contract are based on its unambiguous language, the Court ultimately need not decide the correct interpretation of the Buy-Out Endorsement at this stage in the litigation.  The only task before the Court at the motion to dismiss stage is to determine whether there is at least sufficient ambiguity in the contract for Columbia's claim to go forward.  The contract language is ambiguous, and Columbia's allegations in the Amended Complaint otherwise state a plausible claim that, in light of the evidence that may be considered when construing an ambiguous contract, its interpretation of the contract is the correct one.  Indeed, Neighborhood Risk does not argue that, should the Court find the contract to be ambiguous, its motion to dismiss nevertheless should succeed.  Accordingly, Neighborhood Risk's motion to dismiss Count One of the Amended Complaint must be denied.

## VI.    Reformation

Count Two of Columbia's Amended Complaint pleads a claim for reformation of the contract to the extent that it fails to conform to the parties' intent at the time that it was drafted and signed.

Under Massachusetts law, contract reformation is possible when the language of the contract "does not reflect the true intent of both parties." *OneBeacon Am. Ins. Co. v. Travelers Indem. Co. of Ill.*, 465 F.3d 38, 41 (1st Cir. 2006) (quoting *Polaroid Corp. v. Travelers Indem. Co.*, 610 N.E.2d 912, 917 (Mass. 1993)). To qualify for reformation, the mistake as to the meaning of the contract must either have been made by both parties, or made by one party while the other party knew that the first party was mistaken. *Polaroid Corp.*, 610 N.E.2d at 917. A contract will be reformed only when the mistake relates to an essential element of the agreement. *Caron v. Horace Mann Ins. Co.*, 993 N.E.2d 708, 711 (Mass. 2013). Furthermore, because reformation is intended to capture an agreement that the parties intended to include in the contract but that, for whatever reason, was mistakenly omitted from the finalized agreement, there must have been an "expressed agreement" and intention to be bound with regard to the term to be reformed. *Id.* at 712 (citing *Sancta Maria Hosp. v. City of Cambridge*, 341 N.E.2d 674, 681 (Mass. 1976)). The same principles as would apply to any other claim for contract reformation apply to insurance policies as well. *Caron*, 993 N.E.2d at 711.

Additionally, because Columbia alleges that the contract should be reformed based on the mistake of one or both parties, the Amended Complaint must meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b), which requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see also Citibank, N.A. v. Morgan Stanley & Co. Int'l, PLC*, 724 F. Supp. 2d 407, 417 (S.D.N.Y. 2010) (applying Rule 9(b) to mutual mistake claim); *Core-Mark Int'l Corp. v. Commonwealth Ins. Co.*, No. 05-cv-0183 (WHP), 2006 WL 2501884, at *8 (S.D.N.Y. Aug. 30, 2006) (same). The primary purpose of the heightened pleading standard is to ensure that a defendant has sufficient notice of the factual basis for the plaintiff's claim, although the rule is also meant to protect a defendant against "improvident charges of wrongdoing," and to minimize

15

the risk of strike suits. *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir.
1991) (citing *Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir. 1990)).

Neighborhood Risk's argument that Columbia has not stated a claim for reformation
relies in part on its assertion that there could not have been a mistake in the parties'
understanding of the contract because Columbia drafted the buyout provision unilaterally. *See*
Def. Mem. at 9 (Dkt. No. 66). This assertion relies on an isolated piece of deposition testimony
that is not suitable for consideration at the motion to dismiss stage, *see supra* at 6, and in any
event is a flat contradiction of the allegations in the Amended Complaint. *See, e.g.*, Am. Compl.
¶ 3 ("Both the original Buy-Out Endorsement and revised Buy-Out Endorsement were fully
negotiated between [Columbia] and [Neighborhood Risk]'s authorized agents, whom NRMC
imparted with actual binding authority."), *id.* ¶ 22 ("[Neighborhood Risk]'s Agents engaged in
numerous and multiple communications with [Columbia] regarding the proposed Buy-Out
including with regard to the treatment, handling and funding of reserves on open claim [sic] for
known losses incurred prior to March 31, 2013."). When considering a motion to dismiss, the
Court accepts all well-pleaded facts as true, and draws all reasonable inferences in favor of the
nonmoving party, which means that Neighborhood Risk's contrary assertions of fact are properly
disregarded.

Neighborhood Risk also presents a cursory argument that Columbia failed to allege any
facts that would demonstrate a mutual mistake, and that its allegations cannot plausibly
demonstrate that the parties were mutually mistaken at the time that the contract was formed.
This argument is so threadbare as to approach waiver, and in any event is simply incorrect.
Columbia alleges that during its negotiations with Neighborhood Risk's agents over the buyout
terms, both parties "expressly intended and agreed that the insurance reserves posted as of March
31, 2013 would remain in force to pay the existing claims." Am. Compl. ¶ 24. Columbia has
further alleged that Neighborhood Risk's agent Albert Shapiro reported to Neighborhood Risk's
board members on April 8, 2010 that the buy-out figure would be "set 25% above incurred
claims valued 24 months after expiration of the Policy." Am. Compl. ¶ 26. On July 22, 2013,

Columbia states, Shapiro said he had an "epiphany" and discovered a "flaw" in the Buy-Out Endorsement that caused it to work in Neighborhood Risk's favor, despite his previous expressions of the intent of the parties when signing the deal. Am. Compl. ¶ 37. These allegations are sufficient to state a claim that the parties had reached a mutual agreement regarding the buy-out provision, and that if the contract is interpreted in the way Neighborhood Risk desires, it should be reformed to match the intent of the parties when contracting. The allegations, if true, plausibly show that a written agreement setting the buyout amount as something other than the full amount of incurred losses, including posted reserved, plus the 25% additional premium reflects a mutual mistake in the parties' understanding of their agreement. The allegations also tend to show that any other understanding of the contract arose long after the agreement was signed and for strategic advantage, which, if true, would lend credence to Columbia's assertion that the parties had an expressed agreement over the buyout provision and intended to be bound by it. Neighborhood Risk's arguments that Columbia's allegations are not factually correct simply do not matter at the motion to dismiss stage.

Neighborhood's Risk assertion that the Amended Complaint fails to comply with Rule 9(b) is cursory and raised only in their reply brief. This combination of underdevelopment and late assertion would be cause enough to reject this argument. *See, e.g.*, *Gramercy Advisors, LLC v. Ripley*, No. 13-cv-9070 (VEC), 2014 WL 5847444, at *3 (S.D.N.Y. Nov. 12, 2014) (collecting cases); *Mateo v. Bristow*, No. 12-cv-5052 (RJS), 2013 WL 3863865, at *8 (S.D.N.Y. July 16, 2013) (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 n.5 (2d Cir. 2006)) ("It is well established … that a court should not 'consider arguments that are raised for the first time in a reply brief.'"). However, Neighborhood Risk's argument is also incorrect on the merits. The Amended Complaint lays out with particularly the circumstances surrounding the alleged mistake, including the initial negotiations between Columbia and Neighborhood Risk or its agents, and the later statements that tend to demonstrate that there was a mistake at the time the contract was signed. Although this case does not involve fraud, the Second Circuit has explained that in fraud cases, Rule 9(b) requires a pleader to "(1) detail the statements (or omissions) that

the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 403 (2d Cir. 2015) (quoting *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004)).  Plaintiff has sufficiently stated analogous matters in its allegations of mistake: (1) that the mistaken statement is that the buyout agreement absolved Neighborhood Risk from transferring posted reserves if it exercised the buyout, Am. Compl. ¶¶ 38-39, 66-68; (2) this mistaken understanding was raised by Albert Shapiro (3) on July 22, 2013, Am. Compl. ¶ 37, and that this position was set forth in Neighborhood Risk's July 25, 2013 communication with Columbia, Am. Compl. ¶ 40, and (4) the understanding is mistaken because it was initially the parties' agreed intent to have the posted reserves paid to Columbia along with any buyout premium, *e.g.* Am. Compl. ¶ 39.  Given that the purpose of Rule 9(b) is to ensure that a defendant has sufficient notice of the factual basis for the plaintiff's claim, the Court concludes that Columbia's allegations are sufficient to put Neighborhood Risk on such notice, and that Neighborhood Risk could not be unaware of the factual basis for the mistake that Columbia has alleged.

Neighborhood Risk's other scattershot arguments similarly do not alter the conclusion that Columbia has stated a claim.  It contends that New York law would not permit a reformation claim when a party alleges only a mistake as to the "legal consequences" of a contract.  *See Compania Embotelladora del Pacifico, S.A. v. Pepsi Cola Co.*, 607 F. Supp. 2d 600, 603 (S.D.N.Y. 2009).  This argument is irrelevant, because Neighborhood Risk has agreed that Massachusetts law governs the reformation claim, and it has pointed to no parallel principle under Massachusetts law.  And its argument that the reformation claim is raised only in the alternative (or, in Neighborhood Risk's words, as a "vague sort of fallback," Def. Reply Mem. at 3 (Dkt. No. 83)), does not demonstrate any legal insufficiency in the claim.  The Federal Rules of Civil Procedure explicitly permit pleading in the alternative.  *See* Fed. R. Civ. P. 8(d)(2).  Neither argument suffices as grounds for dismissal.

Columbia has alleged a plausible factual basis for reformation under Massachusetts law, and Neighborhood Risk's motion to dismiss must therefore be denied as to Count Two of the Amended Complaint.

**VII.   Conclusion**

For all of the foregoing reasons, although the Court will not consider for the purposes of this motion the extraneous documents Neighborhood Risk submitted, Columbia's motion to strike is DENIED.  Neighborhood Risk's motion to dismiss is also DENIED.

This resolves Docket Nos. 64 & 79.

Discovery on this motion having closed, *see* Dkt. No. 93, the parties shall submit a joint letter by June 15, 2015, indicating whether either or both parties intend to move for summary judgment.  If either party intends to so move, any such motion must be filed, along with supporting memoranda and materials, by July 15, 2015.  Responses shall be filed by July 29, 2015, and replies by August 5, 2015.

If neither party intends to move for summary judgment, the parties are to indicate in their joint letter (1) the estimated length of trial; (2) dates that the parties are available for trial; and (3) a proposed schedule for submission of pretrial materials.


SO ORDERED.



Dated: June _____, 2015
       New York, New York

_____
          ALISON J. NATHAN
       United States District Judge

19

**Appendix A**

**SELF INSURED RETENTION ENDORSEMENT**

1. In consideration of the premium charged, it is agreed that the limits of insurance for each of the coverages provided by this policy (including coverage found under the general aggregate limit, products-completed operations aggregate limit, personal injury & advertising injury limit, damages to premises rented to you limit, medical payment and any endorsements such as employee benefits or any other endorsements that are added to the policy) will apply excess of a self-insured retention (hereinafter referred to as the Retention Amount)

The Retention Amount of this policy is:

$100,000 SIR – BI & PD, Personal Injury & Adv. Injury, etc (per SIR endt.) – Per Occurrence-All Other Claim Types

$1,125,000 SIR – Aggregate

The S.I.R shall be eroded by allocated claim costs including defense and/or by pure loss of indemnity costs.

* * *

4. Our obligation to pay damages on behalf of the insured applies only to the amount of damage in excess or the Retention Amount stated in the schedule in Section #1 of this endorsement.

5. This policy does not apply to, and we have no obligation under the policy to provide investigation or defense for claims or suits seeking damages within the Retention Amount stated in Section #1 of this endorsement. We shall have the right, but not the duty to make any investigations we deem necessary, but have no obligation to defend such claims or suits.

We shall have the right, but not the duty, to participate with you at our own expense in the defense or settlement of any claim or suit seeking damages covered under this policy. In the event of a claim or suit which in our reasonable judgment may result in payments, including supplementary payments, in an amount in excess of the Retention Amount, we may assume control of the defense or settlement of such claim or suit. You will continue to be responsible for the payment of the Retention Amount.

We shall not be obligated to advance any amounts within the Retention Amount that the Insured may be obligated to pay. However, while retaining all rights to defend suits under this policy, we may advance sums in the defense of any claims or suits. In the event such funds are advanced, the insured shall immediately reimburse us upon demand.

* * *

6. All initial notices are to be sent immediately to the loss adjusting company…[.]

> e. The insured or its loss adjusting company must on our written request provide a complete duplicate file of any claim and provide us with quarterly loss summaries of the activities on all incidents and claims detailing the date of loss, the date of notice, the reserve, the expense, and the indemnity – both paid and outstanding.

> f. We have the right to conduct a claim audit or review of claims being handled by the loss adjusting company at any time we deem necessary. It should be expected that a review will occur at least yearly.

7. The insured must retain an independent loss adjusting company to handle all claims covered under this policy.