UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

Columbia Casualty Company,

          Plaintiff,

    –v–

Neighborhood Risk Management Corporation,

          Defendant.

---

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: AUG 2 2 2016

14-cv-48 (AJN)

MEMORANDUM & ORDER

ALISON J. NATHAN, District Judge:

    Plaintiff Columbia Casualty Company ("Columbia") brings this suit against Defendant Neighborhood Risk Management Corporation ("Neighborhood") to resolve a dispute over an insurance contract between the parties. The contract permitted Neighborhood to "buy out" its obligation to pay the first $100,000 of each claim by making a lump sum payment to Columbia three years after the policy went into effect. Columbia argues that if this option were exercised, funds that Neighborhood reserved prior to the buyout date to cover specific outstanding claims would still be used to pay those claims. Neighborhood disagrees, arguing that after a buyout all outstanding claims would become Columbia's responsibility, and Neighborhood could therefore retrieve any reserved funds. Columbia seeks a declaratory judgment, pursuant to 28 U.S.C. § 2201, that its interpretation of the contract is correct. In the alternative, Columbia requests reformation of the contract to match its intent. Neighborhood, in turn, counterclaims for breach of contract and bad faith. Columbia now moves for summary judgment on its claims and Neighborhood's bad faith counterclaim. For the following reasons, Columbia's motion for summary judgment is granted.

1

I.   **Background**

Neighborhood is a nonprofit organization that helps its members obtain property and general liability insurance at lower rates and with broader coverage than they could obtain individually. Neighborhood's Resp. to Columbia's Statement of Undisputed Material Facts ("Undisputed Facts") ¶¶ 1–2. Neighborhood obtained a group insurance policy from Columbia covering the period from April 1, 2010, to April 1, 2011. *Id.* ¶ 6. The policy included a $100,000 "retention" (similar to a deductible), meaning that Neighborhood was required to pay the first $100,000 of each claim under the policy, with Columbia to pay any remainder. *Id.* ¶ 7. Neighborhood's total retention liability was capped at $1.125 million, regardless of the number of claims. *Id.* Neighborhood raised a $1.125 million retention fund to cover its liability, which the organization deposited with its insurance broker. Pl.'s Ex. H at 59:2–21, 60:6–10; Pl.'s Ex. F at 32:4–7.

A third-party administrator, Tristar, handled all claims under the policy, and requested money from the retention fund as necessary. Pl.'s Ex. H at 59:19–60:2. Tristar had the authority to unilaterally settle claims under $10,000. Pl.'s Ex. P at 20:8–15. For larger claims, Tristar would determine the "reserve"—the expected liability—within five days after receiving a claim file. *Id.* at 24:11–17. Neighborhood's broker would then post money from the retention fund with Tristar to cover the reserve. Ex. H 62:6–16, 63:6–8. Tristar was authorized to unilaterally set reserves up to $25,000, but required Neighborhood's consent to set greater amounts. Undisputed Facts ¶ 31; Pl.'s Ex. P at 20:17–21, 29:15–23. The initial reserve could later be modified if the liability estimate changed. *Id.* at 28:21–29:23.

The disputed contract provision in this suit, the buyout clause, permitted Neighborhood to buy out the remainder of its potential retention liability three years after the 2010–11 policy came into effect. Undisputed Facts ¶¶ 22, 28. The buyout clause was included at Neighborhood's request. *Id.* ¶ 19. The purpose of the buyout clause was to enable Neighborhood to free up the funds dedicated to covering the 2010–2011 retention and put them towards the retention for future policy years. Pl.'s Ex. H at 58:12–21. In order to exercise the

buyout option, the contract required Neighborhood to pay an additional premium of 25% of the value of all losses incurred under the policy as of March 31, 2013 (the "buyout date"). Undisputed Facts ¶ 24. The losses incorporated into the buyout formula included reserves as well as monies already paid to satisfy claims. *Id.*; Pl.'s Ex. H at 82:9–14. The full text of the buyout clause is as follows:

### SIR BUYOUT TERMS

1) All open claims handled by [Tristar] will be reviewed by [Columbia] 30–33 months from the inception date of the policy.

2) The following methodology will be used to calculate the Additional Premium required in order for [Columbia] to assume liability for losses in the insured's retention after three years (36 months) of development.

   Additional Premium = Policy Period Losses evaluated as of 36 months x 0.25

   The losses will be evaluated as of 36 months *in the loss run from [Tristar]*

   For example, losses for the 4/1/2010–2011 policy period will be evaluated as of 3/31/2013.

   Policy Period Losses include:
   -Paid Losses
   -Paid ALAE
   -Case Loss Indemnity Reserves
   -Case ALAE Reserves
   -All claims within the insured's $100,000 retention, open and closed, on a first dollar basis.

3) [Columbia] will calculate the additional premium for SIR buy-out approximately 37 months from inception.

4) [Columbia] will prepare a premium bearing endorsement in April 2013 with the additional premium for the buy-out. The insured must pay this additional premium within 30 days of offer. If the premium is not paid within this time frame, the SIR buy-out terms will not apply. The Self-Insured Retention Endorsement terms will continue to apply.

5) The additional premium will be booked as premium with commission.

> 6) The insured's retention will become Nil after payment of the additional premium.
>
> 7) The $1,125,000 SIR Aggregate listed on the Self-Insured Retention Endorsement is the maximum retention for the insured.

Undisputed Facts ¶ 24. This language reflects revisions implemented at Neighborhood's request after the policy was first issued. *Id.*

As the three-year mark approached, Neighborhood expressed interest in exercising its rights under the buyout clause. Columbia provided a quote of $219,202.64 for the 25% additional premium on June 26, 2013, and requested that reserves currently held by Tristar be transferred to Columbia (who would be taking over the duty of handling claims). *See* Compl. ¶ 34; Answer ¶ 34. On July 22, 2013, Albert Shapiro, Neighborhood's insurance consultant, wrote an email to Neighborhood's executive director informing her of his discovery that the buyout clause "may have a flaw in the language (in [Neighborhood's] favor)." Undisputed Facts ¶ 29. Specifically, Shapiro claimed that a buyout would relieve Neighborhood of responsibility for outstanding reserves set prior to the buyout date. *Id.* In a second email, dated August 7, 2013, Shapiro contrasted this position (which he called the "literal interpretation" of the buyout clause) with "the original intent of the underwriter (and [Neighborhood])" that Neighborhood would remain responsible for those outstanding reserves in the event of a buyout. *Id.* ¶ 30. Neighborhood rejected Columbia's buyout quote on July 25, 2013, and countered that it was only willing to pay an additional premium of $174,648.39. Compl. ¶ 40; Answer ¶ 40. Columbia initially rejected this offer. Compl. ¶ 40; Answer ¶ 40. On August 23, 2013, however, Columbia made a second offer accepting Neighborhood's number for the additional premium, and requesting the transfer of $445,298 posted to cover reserves as of the buyout date. Compl. ¶ 41; Answer ¶ 41. Neighborhood rejected the August 23, 2013, offer, and several months of further negotiations proved fruitless. Compl. ¶¶ 42–46; Answer 42–46.

Columbia filed suit against Neighborhood on January 6, 2014. Columbia seeks a declaration from the Court that in the event of a buyout, all funds posted to cover reserves as of March 31, 2013, would be applied to the pending claims for which they were posted, and not

4

refunded to Neighborhood. In the alternative, Columbia seeks reformation of the contract to match its interpretation. Neighborhood counterclaimed for breach of contract and bad faith.

Neighborhood moved to dismiss the complaint, claiming that the unambiguous text of the contract forecloses Columbia's interpretation. Dkt. No. 66. On June 29, 2015, the Court denied Neighborhood's motion to dismiss, rejecting Neighborhood's argument that buyout clause was unambiguous as to the disposition of reserve funds posted prior to the buyout date. *Columbia Cas. Co. v. Neighborhood Risk Mgmt. Corp.*, No. 14-CV-0048 AJN, 2015 WL 3999192, at *1 (S.D.N.Y. June 29, 2015). In the wake of the Court's decision on the motion to dismiss, the parties proceeded to discovery. On September 13, 2015, Columbia filed its motion for summary judgment. Dkt. No. 120.

## II.     Legal Standard

Summary judgment is appropriate when, after reviewing the parties' submissions in the light most favorable to the non-moving party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuinely in dispute" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When the Court considers a motion for summary judgment, "all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought." *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223 (2d Cir. 1994). The initial "burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists." *Id.* If the movant "demonstrates the absence of a genuine issue of material fact, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact" to survive summary judgment. *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation marks and citations omitted). However, "[a] party opposing summary judgment does not show the

existence of a genuine issue of fact to be tried merely by making assertions that are conclusory or based on speculation." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008) (citations omitted); *see also Anderson*, 477 U.S. at 249–50 (summary judgment "may be granted" if the opposing evidence is "merely colorable" or "not significantly probative").

### III. The Buyout Clause Does Not Relieve Neighborhood of Responsibility for Reserves Outstanding at the Buyout Date

This case presents a straightforward question of contract interpretation. Columbia argues that in light of its extrinsic evidence, any reasonable jury would conclude that in the event of a buyout, the parties intended that all funds posted to cover reserves as of March 31, 2013, would be applied to the pending claims for which they were posted, and not refunded to Neighborhood. For the reasons below, the Court agrees.

#### A. Contract Interpretation Under New York Law

The Court previously determined that New York law applies to the interpretation of the contract in this case. *Columbia*, 2015 WL 3999192, at *6. Under New York law, "the initial interpretation of a contract is a matter of law for the court to decide." *K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996) (internal quotation marks and citation omitted). If the parties dispute the meaning of "the terms of an insurance contract, New York insurance law provides that 'an insurance contract is interpreted to give effect to the intent of the parties as expressed in the clear language of the contract.'" *Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006) (quoting *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000)). In assessing the intent of the parties, a court must first make a threshold determination as to "whether the terms of the insurance contract are ambiguous." *Morgan Stanley*, 225 F.3d at 275. When an insurance contract's provisions "are unambiguous and understandable, courts are to enforce them as written." *Parks Real Estate*, 472 F.3d at 42. But if, as here, a court determines "that an

6

insurance provision is ambiguous, the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." *Morgan Stanley*, 225 F.3d at 275–76 (internal quotation marks and citation omitted).

Once the Court has reviewed the extrinsic evidence, there are three possible outcomes. First, if the extrinsic evidence is too weak to "yield a conclusive answer as to the parties' intent," interpretation of the contract remains a matter of law for the Court. *Id.* at 276. In that case, the Court "may apply other rules of contract construction, including the rule of contra proferentem, which generally provides that where an insurer drafts a policy any ambiguity in the policy should be resolved in favor of the insured." *Id.* (internal quotation marks, citation, and alterations omitted). Second, if the "determination of the intent of the parties depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence, then such determination is to be made by the jury." *D v. Stewart Title Ins. Co.*, 124 A.D.3d 824, 825–26 (N.Y. App. Div. 2015)) (quoting *Hartford Acc. & Indem. Co. v. Wesolowski*, 305 N.E.2d 907, 909 (1973)). Finally, if "a party's extrinsic evidence demonstrates not only that its interpretation is reasonable but that it is the only fair interpretation," then summary judgment is appropriate. *Id.* (citation and quotation marks omitted).

### B. The Text of the Buyout Clause Is Ambiguous

In its June 29, 2015 decision denying Neighborhood's motion to dismiss, the Court held that the buyout clause was ambiguous. *Columbia*, 2015 WL 3999192, at *9. The buyout clause provides that Columbia, upon receipt of the 25% additional premium, will "assume liability for all losses in the insured's retention after three years." However, that language could mean either (1) that Columbia will take responsibility only for reserves set after the buyout date, or (2) that at the buyout date, Columbia will take responsibility for all unpaid claims, even if the claims were known, reserves set, and reserve funds posted prior to the buyout date.

Neighborhood argued that the unambiguous language of the contract requires the second interpretation. Neighborhood pointed out that the buyout clause requires Neighborhood to pay

7

only the 25% additional premium, and makes no mention of transferring funds or otherwise paying off reserves. Neighborhood also relied on the buyout clause's language providing that Neighborhood's "retention will become Nil after payment of the additional premium." If the retention no longer existed, Neighborhood argued, it could no longer be required to cover the reserves.

The Court rejected Neighborhood's argument, explaining that "the clarity of the buyout formula itself does not end the inquiry when it is ambiguous exactly which expenses the insured is 'buying out.'" *Id.* at *8. The Court also determined that "a reasonable person could construe the contractual terms to place reserves outside of the retention calculation," meaning that Neighborhood's preexisting reserve obligations—and the funds placed with Tristar to meet those obligations—might not be affected by the end of its retention. *Id.* Finally, the Court observed that Neighborhood's interpretation ran contrary to the "internal logic of the insurance contract as a whole." *Id.* The buyout clause transfers risk of future liability arising from the 2010–2011 policy year from Neighborhood to Columbia. As compensation for accepting this risk, Columbia would receive a lump sum equal to 25% of the total liability for claims filed against the policy over the first three years. Under Neighborhood's interpretation, however, a buyout would also force Columbia to accept significant liability for claims filed during the pre-buyout period without any additional compensation. And the amount of past liability Columbia would be required to take on could vary wildly depending on how quickly Tristar happened to resolve claims and pay out reserves. For these reasons, the Court concluded that "[t]he contract language is ambiguous," and that Columbia's complaint stated a plausible claim to be considered in light of extrinsic evidence. *Id.* at 9.

### C. Extrinsic Evidence Justifies Summary Judgment in Columbia's Favor

Because the language of the contract is ambiguous, the Court turns to the extrinsic evidence developed by the parties over the course of discovery. Neighborhood did not negotiate the insurance policy with Columbia directly. Undisputed Facts ¶ 14. Instead, it relied on its

8

insurance consultant, Albert Shapiro, its retail insurance broker, USI, and its wholesale insurance broker, Partners Specialty Group. *Id.* ¶¶ 4, 9, 10–12. Negotiations with Columbia over the buyout clause were handled by Joyce Kutz of USI, in consultation with Shapiro (though Shapiro never had any direct contact with the insurer). *Id.* ¶¶ 15–17; Pl.'s Ex. E at 32:21–34:18; Pl.'s Ex. J at 25:20–24, 49:5–9. Columbia's end of the contracting process was handled by an underwriter named Gale Smith. Pl.'s Ex. G at 8:2–10; Pl.'s Ex. H at 34:20–22. As explained below, extrinsic evidence of the negotiators' intent demonstrates that Columbia's interpretation of the contract is correct, and no reasonable jury could find otherwise.

In her deposition, Kutz testified that her understanding of the buyout clause was that money from the retention allocated to reserves prior to the buyout date would be used to pay claims rather than being returned to Neighborhood. *See* Pl.'s Ex. H at 57:10–11, 57:23–58:4, 63:6–9, 65:18–23, 83:1–13, 102:16–103:2, 118:14–17. Kutz acknowledged that "the idea . . . behind the buy-out arrangement was that the reserves would not be refunded back to the insured." *Id.* at 63:21–64:2. She explained that in the event of a buyout, Columbia might leave the reserve funds with Tristar to administer, or take the money and settle claims itself. *Id.* at 64:14–18. Either way, she stated, Neighborhood "wasn't going to get the money. That was there to pay those claims." *Id.*

Neighborhood is bound by Kutz's understanding and intent regarding the buyout clause. Kutz, a broker at USI, served as Neighborhood's authorized agent in negotiating the policy in general and the buyout clause in particular. Undisputed Facts ¶¶ 9, 11, 15–17; Pl.'s Ex. C ¶¶ 6–11, 18–21, 43–45, 65–66; Pl.'s Ex. E at 21:2–22:4, 25:8–24, 32:21–33:5. Kutz had unrestricted authority to communicate with Columbia regarding the buyout clause. Pl.'s Ex. E at 25:18–24. Harold Nassau, USI's point of contact on Neighborhood's board of directors, conceded at deposition that Neighborhood's original intent regarding the buyout clause was whatever Kutz (and Shapiro) intended. Pl.'s Ex. E at 56:20–57:1. Even if Neighborhood claimed to have an intent separate from its agent, however, that intent would be irrelevant. Under New York law, "an insurance broker acts as the insured's agent in procuring the insurance policy." *In re Sept.*

9

*11th Liab. Ins. Coverage Cases*, 458 F. Supp. 2d 104, 117 (S.D.N.Y. 2006). Accordingly, an insurance broker's understanding and representations in the course of procuring an insurance policy are imputed to the insured "by operation of law." *Id.*; *see Two Farms, Inc. v. Greenwich Ins. Co.*, 993 F. Supp. 2d 353, 364 (S.D.N.Y. 2014), *aff'd*, 628 F. App'x 802 (2d Cir. 2015) ("The understandings of both [brokers] are properly imputed to [the insured] because both insurance brokers were acting on behalf of [the insured]."); *Ribacoff v. Chubb Grp. of Ins. Cos.*, 2 A.D.3d 153 (N.Y. App. Div. 2003)); *Gelb v. Autom. Ins. Co. of Hartford*, 168 F.2d 774, 775 (2d Cir. 1948); *Standard Oil Co. v. Triumph Ins. Co.*, 64 N.Y. 85 (1876).

Kutz's account of Neighborhood's original intent in negotiating the buyout clause is reinforced by evidence from Shapiro, Neighborhood's insurance consultant. In an email sent on August 7, 2013, Shapiro indicated that the "original intent of the underwriter (and [Neighborhood])" regarding the buyout clause was that Neighborhood would need to pay outstanding reserves as of the buyout date in addition to the 25% additional premium.[1] Undisputed Facts ¶ 30; Pl.'s Ex. F at 111:21–25. Shapiro contrasted this position to what he called the "literal interpretation" of the buyout clause, in which Neighborhood would pay only the additional premium and Columbia would assume liability for all outstanding reserves. Undisputed Facts ¶ 30. At deposition, Shapiro admitted that he first considered the possibility that the buyout clause could be read to relieve Neighborhood of responsibility for outstanding reserves around July 22, 2013, when he emailed Neighborhood's executive director to say he had found a potential "flaw" in the contractual language. Ex. F. at 173:1–3. Shapiro further stated that prior to 2013 "I think that everyone [involved in the creation of the buyout clause] was under the assumption" that Neighborhood would remain responsible for reserves set prior to the buyout date. *Id.* at 217:22–25.

---

[1] Neighborhood claims that Shapiro's emails are inadmissible hearsay, and therefore should not be considered by the Court on summary judgment. Def.'s Br. at 9 (citing Fed. R. Civ. P. 56(c)(2)). However, as Columbia points out, the emails are admissible under Fed. R. Evid. 801(d)(2)(D).

10

Gale Smith, the Columbia underwriter, shared Neighborhood's agents' understanding of the buyout clause at its inception. In her deposition, Smith explained that her understanding of the parties' intent was that "the insured is responsible for all the losses in their 100,000 layer up until the buy-out date. It could be paid, it could be open reserves, but the insured is responsible for that." Pls.' Ex. G at 53:22–54:2. Smith believed that the buyout clause permitted Neighborhood to limit its obligations to "whatever is paid plus whatever the reserves were at this period of time." *Id.* at 13:24–14:1. To the extent that there were any reserves outstanding as of the buyout date, Smith intended that "[t]hose reserves would be the insured's responsibility as set forth by the self-insured retention endorsement under the policy." *Id.* at 16:21–23.

The extrinsic evidence from Kutz, Shapiro, and Smith is sufficient to meet Columbia's burden of production and demonstrate that there is no genuine issue of material fact regarding what the parties intended the buyout clause to mean. *See Gallo*, 22 F.3d at 1223. Read in light of the extrinsic evidence, the buyout clause does not relieve Neighborhood of responsibility for claims pending from before the buyout date, nor does it provide an opportunity for Neighborhood to retrieve its reserve funds.

To resist summary judgment, Neighborhood must now "come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Eli Lilly*, 654 F.3d at 358. Neighborhood has failed to do so. First, Neighborhood argues that there is a genuine issue of material fact because Columbia has not provided *contemporaneous* evidence of the parties' intent. Def.'s Br. at 11. But Neighborhood provides no authority or reasoning for this proposition, and the Court sees no reason why uncontroverted deposition testimony cannot support a motion for summary judgment. Second, Neighborhood observes that Columbia "unilaterally" drafted the formula for the 25% additional premium in the buyout clause. Def.'s Br. at 12. This is irrelevant. As the Court previously determined, the contract as a whole is ambiguous as to reserves posted prior to the buyout date. Because Columbia has put forward sufficient extrinsic evidence to resolve the ambiguity, the Court need not and cannot apply the canon of construing an ambiguous contract provision against the drafter. *See Morgan Stanley*,

11

225 F.3d at 276. Finally, Neighborhood points to deposition testimony from both Smith and Kutz that the buyout formula makes no provision for transferring reserves to Columbia. Def.'s Br. at 11–12 (citing Ex. H at 121; Defs.' Ex. D at 57). True enough, but neither does the buyout formula relieve Neighborhood of reserve liability for pending claims. It is the buyout clause as a whole, together with the rest of the contract, that determines the disposition of reserves set prior to the buyout date. *See Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000). And as discussed above, all relevant evidence demonstrates that the contracting parties' original intent for the buyout clause matches Columbia's interpretation and not Neighborhood's.

For these reasons, the Court concludes that there is no genuine issue of material fact regarding the parties' intent. Because the extrinsic evidence resolves the contract's ambiguity, and leaves Columbia's reading as the only fair interpretation, the Court grants summary judgment.

## IV.  Neighborhood's Bad Faith Counterclaim is Dismissed

Columbia also seeks summary judgment on Neighborhood's bad faith counterclaim. Neighborhood concedes that its bad faith counterclaim fails to state a claim. Def.'s Br. at 16. It is therefore dismissed.

## V.  Conclusion

For the reasons above, Columbia is entitled to summary judgment on its declaratory judgment claim. The Court declares that in the event of a buyout, all reserve funds posted as of March 31, 2013, would be applied to the pending claims for which they were posted, and not refunded to Neighborhood. Neighborhood's bad faith counterclaim is dismissed.

The parties are ordered to submit a joint letter to the Court regarding the status of any remaining claims and a proposal for further scheduling of the case on or before September 2, 2016.

SO ORDERED.

Dated: August __, 2016
New York, New York

_____
ALISON J. NATHAN
United States District Judge